1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

17

KLAMATH SISKIYOU WILDLANDS
CENTER and KLAMATH FOREST
ALLIANCE,

               Plaintiffs,

     v.

UNITED STATES FOREST SERVICE et
al.,

               Defendants.

No.  2:12-cv-1676-TLN-CMK

**MEMORANDUM AND ORDER**

18

19

20

21

22

23

24

25

26

27

28

      The matter is before the Court on cross-motions for summary judgment by Plaintiffs

Klamath Siskiyou Wildlands Center and Klamath Forest Alliance ("Plaintiffs") and Defendants

United States Forest Service, District Ranger David Hays, and Forest Service Chief Tom Sidwell

("Defendants").  At issue is Defendants' review and approval of the High Bar Mining Project (the

"Project"), a gold mining operation located in the Salmon River watershed in northern California.

Plaintiffs allege that Defendants' review and approval violated the National Environmental Policy

Act (NEPA), the National Forest Management Act (NFMA), the 1872 Mining Law, and the

Administrative Procedure Act (APA).  Plaintiffs request that the Court vacate the decision

documents for the Project, declare that Defendants' approval is in non-compliance with the

applicable statutes, and enjoin the Project from proceeding.  Defendants respond that their

approval of the Project complies with the applicable statutes.  For the reasons discussed below,

1  Plaintiffs' motion for summary judgment (ECF No. 53) is DENIED.  Defendants' motion for
2  summary judgment (ECF No. 68) is GRANTED.

3  **I. <u>Statutory Background</u>**

4  i.  <u>30 U.S.C. §§ 21–54; 36 C.F.R. § 228 *et al.*</u>

5          Under 30 U.S.C. § 22, "all valuable mineral deposits in land belonging to the United
6  States … shall be free and open to exploration and purchase, and the lands in which they are
7  found to occupation and purchase, by citizens of the United States …."  Under 30 U.S.C. § 26,
8  the "locators of all mining locations … situated on the public domain … shall have the exclusive
9  right of possession and enjoyment of all the surface included within the lines of their locations
10 …."  The related statutory framework for U.S. mining laws is contained in 30 U.S.C. §§ 21–54.
11 The provisions of 36 C.F.R. § 228 *et al.* regulate the "use of the surface of National Forest
12 System lands in connection with operations authorized by the United States Mining laws (30
13 U.S.C. 21–54)" such that this use "minimize[s] adverse impacts on National Forest system
14 surface resources.  It is not the purpose of these regulations to provide for the management of
15 mineral resources; the responsibility for managing such resources is in the Secretary of the
16 Interior."  36 C.F.R. § 228.1[1]

17 ii.  <u>National Forest Management Act</u>

18         The NFMA and its implementing regulations provide for forest planning and management
19 by the Forest Service at two levels: the forest level and the site-specific project level.  16 U.S.C. §
20 1604; *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729–30 (1998).  On the forest level, the
21 Forest Service develops a Land and Resource Management Plan ("LRMP") which consists of
22 broad, long-term plans and objectives for the entire forest.  In this case the applicable LRMP is
23 the Klamath LRMP, which is part of the Northwest Forest Plan ("NFP").  At the project level, the
24 project must be consistent with LRMP and NFP standards.  16 U.S.C. § 1604(i).

25 ---
[1] *See* § 228.4 (providing for the submission of a plan of operations by the Proponent); § 228.6 (providing that the
26 information submitted by the Proponent be available for public examination); § 228.7 (providing for periodic
inspection of operations by the Forest Service); § 228.8 (describing requirements for environmental protection); §
27 228.43 (providing for the policy governing disposal of mined materials); § 228.13 and § 228.51 (requiring that a bond
be furnished to the authorized officer to enforce payment, reclamation, and other conditions of the contract or permit
28 issued by the governing agency).

2

iii.  <u>National Environmental Policy Act</u>

The NEPA has twin aims: first, it requires federal agencies "to consider every significant aspect of the environmental impact of a proposed action," and second, "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process." *Kern v. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002) (quoting *Baltimore Gas & Electric Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983)). NEPA requires federal agencies to take a "hard look" at the environmental effects of their proposed action, even after the proposal has received initial approval. *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989).

As part of the required "hard look," NEPA and its implementing regulations require federal agencies to prepare a "detailed statement" concerning "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  The statement must consider the impact of the proposed action, any adverse environmental effects, alternatives to the proposed action, the relationship between short-term uses and the "maintenance and enhancement of long-term productivity," and any irreversible commitments of sources which would result from implementing the action.  *Id.*  This statement may take the form of an environmental assessment ("EA"), or a longer and more thorough environmental impact statement ("EIS"), which includes a longer public comment period.  *See* 40 C.F.R. §§ 1508.9, 1508.11.

In determining whether to prepare an EIS, the agency shall determine: 1) whether the proposed project normally requires an EIS, or 2) if the project is categorically excluded from the preparation of both an EA and an EIS because the action does not individually or cumulatively have a significant effect on the human environment.  40 C.F.R. § 1501.4; 40 C.F.R. § 1508.4.  In making this determination, absent a categorical exclusion of an EA and an EIS, the agency shall prepare an EA to determine whether an additional EIS is needed.[2]  40 C.F.R. 1501.4(c).  An EA

---

[2] 40 C.F.R. § 1501.4 states: "In determining whether to prepare an environmental impact statement the Federal agency shall: (a) Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal in one which: (1) Normally requires an [EIS], or (2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).  (b)  If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9).  The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1)."

1   "[s]hall include brief discussions of the need for the proposal, of alternatives as required by

2   [NEPA] section 102(2)(E), of the environmental impacts of the proposed action and alternatives,

3   and a listing of agencies and persons consulted."  40 C.F.R. § 1508.9(b).  If the agency concludes

4   on the basis of the EA that no additional EIS is required, the agency must prepare a "finding of no

5   significant impact" ("FONSI").  40 C.F.R. 1501.4(e).  In this case, Defendant prepared a final

6   revised EA and a Supplemental Information Report ("SIR"), which each culminated in a FONSI.[3]

7   (HBAR 15064; HBAR 2481.)  An EIS was not prepared.

8       The agency must also consider the "cumulative impacts" of a proposed project, which the

9   federal regulations define as the result of "the incremental impact of the action when added to

10  other past, present, and reasonably foreseeable future actions…" 40 C.F.R. § 1508.7.  Cumulative

11  impacts may result from "individually minor but collectively significant actions taking place over

12  a period of time."  *Id.*  In determining whether a project will have a "significant" impact on the

13  environment, an agency must consider "[w]hether the action is related to other actions with

14  individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7); *see*

15  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998)

16  **II.  The High Bar Placer Mine Phase 2 Project**[4]

17  i.  Consultation history

18      On May 17, 2008, the High Bar Place Mine Phase 1 Project Decision Memo was signed

19  by District Ranger Ray Haupt.  In August 2008, the excavation of a sampling trench was

20  completed.  In October 2008, Wabuska Mining, LLC (the "Proponent") submitted a plan of

21  operations for the development of the High Bar Mining Project.  Initially, SHN Consulting

22  Engineers & Geologists, Inc. prepared an Environmental Assessment (EA) for the Proponent,

23  which was distributed for comment by the Forest Service in August 2009.  On December 17,

24  2009, the Forest Service issued a Decision Notice for the August 2009 EA along with a FONSI.

[3] The SIR concluded: "the [Forest Service] interdisciplinary team specialists [] found that the proposed modifications will not result in any significant or uncertain effects that were not previously analyzed."  (HBAR 15064.)

[4] The facts of this section are taken from the FAC (ECF No. 36), Defendants' answer (ECF No. 39), Plaintiffs' and Defendants' statements of undisputed facts (ECF Nos. 51, 70), and the EA and SIR.

4

In March 2010, following the receipt of two appeals, the Forest Service rescinded the 2009 EA. In April 2010, the Forest Service issued a decision notice for a revised EA along with a FONSI. In July 2010, following receipt of another appeal, the Forest Service rescinded that EA.  In April 2011, the Forest Service issued a third EA.  On January 30, 2012, the Forest Service issued a revised EA (the "EA"), which incorporated comments and revisions from the previous EAs.[5]  On August 13, 2012, subsequent to the filing of the instant complaint (ECF No. 1), the Proponent notified Defendants of its intent to amend operations for the Project; the primary modification was a change in location of the mill facility to a site on private land.  On February 8, 2013, the Forest Service issued a Supplemental Information Report (the "SIR") concerning the proposed modifications, which concluded that the modifications would not result in any significant or uncertain effects not previously analyzed.  (*See* HBAR 2541–42, 15051, 15064.)

ii.  The Salmon River watershed

The Project, which includes separate mining and milling locations, is located in the Salmon River watershed near the Forks of Salmon Community in Siskiyou County, California.  (ECF No. 51 ¶ 1; ECF No. 70 ¶ 1.)  The Salmon River watershed includes South Fork ("SF") Salmon River and McNeal Creek, and is a Northwest Forest Plan designated "Key Watershed" for salmon recovery that includes areas designated as essential habitat and critical habitat.  (ECF No. 51 ¶ 6; ECF No. 70 ¶ 6.)  Specifically, the Salmon River watershed provides critical habitat for threatened Southern Oregon and Northern California Coast ("SONCC") coho salmon and essential habitat for Chinook and coho salmon.  (ECF No. 51 ¶ 8; ECF No. 70 ¶ 8.)

iii.  McNeal Creek

McNeal Creek flows northeast and delivers cold water into the South Fork Salmon River.  (ECF No. 51 ¶ 4; ECF No. 70 ¶ 4.)  Surveys show that SONCC coho salmon, Chinook salmon, steelhead (winter and summer), and rainbow trout use the thermal refugia that exists at the site of McNeal Creek's outflow into Salmon River.  (ECF No. 51 ¶ 9; ECF No. 70 ¶ 9; HBAR 3400, 3434.)

---

[5] Unless otherwise indicated, the Court intends "EA" to denote the final 2012 EA (beginning at HBAR 2536).

1    The Project Design Features ("PDFs") for the Project, as described in the EA, provide that

2    water for mining operations will be withdrawn from McNeal Creek through the use of an electric

3    pump and hoses.  (HBAR 2552.)  The Proponent may withdraw water only for 30 minutes per

4    day, no more than 200 gallons per minute (thus no more than 6,000 gallons per day), and only

5    between midnight and 8:00 AM.  (HBAR 2552.)  Water may be diverted only when the stream

6    flow is at or above 4.5 cfs.  (HBAR 2552.)

7    iv.  Mining

8    The Court views the parties' respective statements of undisputed facts to state that the

9    Proponent will extract a total of 43,500 cubic yards of material from the mine site, of which

10   approximately 19,000 cubic yards will be topsoil and overburden soil, and approximately 24,500

11   cubic yards will be milled for valuable minerals.[6]  (ECF No. 51 ¶ 27, 28; ECF No. 70 ¶ 27, 28.)

12   The topsoil and overburden will be stockpiled on site and used to fill excavated sections of the

13   mine as the mining progresses.  (ECF No. 51 ¶ 29; ECF No. 70 ¶ 29.)

14   v.  Supplemental Information Report/Milling

15   The Proponent initially proposed an on-site mill location.  (HBAR 2543.)  In August

16   2012, the Proponent verbally informed the Forest Service of proposed modifications to the

17   Project, including moving the milling operations to a private site approximately one mile from the

18   mine site.  (HBAR 15051.)  In February 2013, the Forest Service completed a Supplemental

19   Information Report (the "SIR") regarding the proposed modifications.  (HBAR 15051–52.)    The

20   SIR concluded: "the [Forest Service] interdisciplinary team specialists [] found that the proposed

21   modifications will not result in any significant or uncertain effects that were not previously

22   analyzed."  (HBAR 15064.)

23   vi.  Hauling between the mine site and mill site

24   Hauling of ore material will be done on a temporary road as analyzed in the EA (HBAR

25   2546) and a National Forest Transportation System Maintenance Level 2 road (road 10N04).

26   (HBAR 15053–54.)  A 12 cubic yard truck was proposed to haul a maximum of fifteen loads a

27

28   [6] At points, the EA and SIR appear to contemplate that 45,000 cubic yards of material will be processed at the mill site.  (*See* HBAR 2590, 15061.)

1  day (or 3,750 loads over a three year period) between the mine and mill sites.  (HBAR 15054.)  A

2  maximum of two 1,500 gallon above-ground water tanks will be placed on the lower portion of

3  the mining claim to facilitate the storage of water for dust abatement; tanks will be located 345

4  feet from McNeal Creek and will require a 12-foot wide by 24-foot long area to be leveled for

5  tank placement.  (HBAR 15054.)

6  vi.  Length of operations

7       The Proponent intends to complete the project within three years.  The EA limits the

8  Proponent's operating season to the 14-week period between July 10 and October 15.  If surveys

9  for northern spotted owl show that no spotted owls are detected in the area, the Proponent may

10  begin operations on May 15.[7]  (ECF Nos. 51, 70; ¶¶ 23, 24.)

11  **III.  Procedural History**

12       On June 2, 2012, the complaint was filed in this Court, alleging violations of NEPA and

13  the NFMA.  The complaint also alleged a violation of the 1872 Mining Act, which the Court

14  construes to allege a violation of the marketability test, as set forth in 18 U.S.C. § 22 and *U.S. v.*

15  *Coleman*, 390 U.S. 599 (1968).  (ECF No. 1.)  On August 13, 2012, the Proponent notified

16  Defendants of an intent to modify the Project, the primary modification being the change in the

17  location of milling operations to a site on private land.  (HBAR 15051.)  Defendants completed a

18  Supplemental Information Report (the "SIR"), concluding that the modifications "will not result

19  in any significant or uncertain effects that were not previously analyzed."  (HBAR 15064.)  On

20  April 11, 2013, Plaintiffs filed a first amended complaint ("FAC"), which alleged new violations

21  of NEPA, the NFMA, and the marketability test, resulting from the proposed modifications.

22  (ECF No. 36.)  On August 2, 2013, Plaintiffs filed a motion for summary judgment, a supporting

23  memorandum, and a statement of undisputed facts.  (ECF Nos. 53, 48, 51.)  On December 18,

24  2013, Defendants filed a cross-motion for summary judgment, a supporting memorandum, and a

25  statement of undisputed facts and response to Plaintiffs' statement of undisputed facts.  (ECF

26  Nos. 68, 69, 70.)  On January 15, 2014, Plaintiffs filed a reply and a response (ECF Nos. 73, 74)

27

28

---

[7] The parties do not dispute the length of the operating period.  The EA at one point contemplates a period of operations between between July 10 and December 31.  (*See* HBAR 2549.)

in support of summary judgment.  On February 5, 2014, Defendants filed a reply in support of summary judgment.  (ECF No. 76.)

## IV.  Summary Judgment: Standard of Review

Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In this case, the Court's review of Plaintiff's NFMA, NEPA, and 30 U.S.C. § 22 claims is governed by the Administrative Procedure Act.[8]  *See Nw. Res. Info. Ctr., Inc. v. NMFS*, 56 F.3d 1060, 1066 (9th Cir. 1995); *Nat. Eco. Counc. v. U.S. Forest Service*, 418 F.3d 953, 960 (9th Cir. 2005).  A court conducting APA judicial review does not resolve factual questions, but instead determines "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Sierra Club v. Mainella,* 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769 (9th Cir. 1985)). "[I]n a case involving review of a final agency action under the [APA] ... the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record."  *Id.* at 89.  In this context, summary judgment becomes the "mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Id.* at 90. Pursuant to the APA, the reviewing Court shall "hold unlawful and set aside agency actions, findings, and conclusions found to be … arbitrary, capricious, or an abuse of discretion or otherwise not in accordance with law," or which have been taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

## V.  Analysis

The Court construes the FAC, the parties' respective summary judgment motions, and the parties' responsive pleadings, to implicate issues regarding: the SIR, milling operations and the Salmon River, contamination of processed ore, withdrawals from McNeal Creek, the thermal refugia at the confluence of McNeal Creek and SF Salmon River, hauling between the mine and

---

[8] To the extent the parties seek summary judgment review of Defendants' review of the Project regarding its "marketability," 30 U.S.C. § 22, this Court also adheres to the APA standard.  Were the Court to adhere to the ordinary rule 56(c) standard of review, this would not alter the Court's determination.

1   mill sites, Aquatic Conservation Strategy objectives, LRMP standards MA10-34 and MA1035,

2   and the marketability of the extracted minerals.

3   i.  The Supplemental Information Report (NEPA)

4     The NEPA Forest Service Handbook 1909.15 § 18.1 (HBAR 4610) describes the function

5   of a SIR:

6       If new information or changed circumstances relating to the
    environmental impacts of a proposed action come to the attention of
7   the responsible official after a decision has been made and prior to
    completion of the approved program or project, the responsible
8   official should review the information carefully to determine its
    importance.

9
    If, after an interdisciplinary review and consideration of new
10  information within the context of the overall program or project, the
    responsible official determines that a correction, supplement, or
11  revision to an environmental document is not necessary,
    implementation should continue.

12
    [The agency shall] [d]ocument the result of the interdisciplinary
13  review in the appropriate program or project file.   This
    documentation is sometimes called a supplemental information
14  report (SIR) and should conclude with whether or not a correction,
    supplement, or revision is needed, and if not, the reasons why.

15
    A SIR is not a NEPA document and therefore cannot be used to
16  fulfill the requirements for a supplemental EA or EIS.   A SIR
    cannot repair deficiencies in the original environmental analysis or
17  documentation, nor can it change a decision.

18    SIRs "are the Forest Service's formal instruments for documenting whether new

19  information is sufficiently significant to trigger the need for a [supplemental EIS]. *Friends of the*

20  *Clearwater v Dombeck*, 222 F.3d 552, 555 (9th Cir. 2000); *see also Idaho Sporting Cong., Inc. v.*

21  *Alexander*, 222 F.3d 562, 566 n.2 (9th Cir. 2000) (citing 40 C.F.R. § 1509(c)(1)(ii) (under NEPA,

22  federal agencies have a continuing duty to supplement existing NEPA documents in response to

23  "significant new circumstances or information relevant to environmental concerns and bearing on

24  the proposed action or its impacts.")).

25    In the instant case, the Forest Service prepared a SIR due to the proposed movement of the

26  milling site from Forest Service land to a private site located approximately one mile away.

27  (HBAR 15053.)  Based on the analysis detailed in the SIR, the Forest Service concluded that "[a]

28  correction, supplement, or revision to the EA or DN/FONSI is not necessary because the effects

are within the scope and range of effects as originally analyzed in the January 2012 EA and do not result in any new or significant impacts." (HBAR 15064.) The SIR assessed that the following modifications would result:

- Ground disturbance on NFS lands will be reduced from 3.95 acres to 3.2 acres.

- All mined material, excluding top soil and over burden, will be hauled to the private site for milling. In addition to the temporary road already analyzed in the EA as part of the proposed action (HBAR 2546), 0.60 miles of an existing National Forest Transportation System ("NFTS") Maintenance Level 2 road (road 10N04) will be used for hauling.

- A 12 cubic yard truck is proposed to haul a maximum of 15 loads a day (or 3,750 loads hauled over a three-year period).

- No ore material will be stockpiled on Forest Service land; topsoil and overburden will be stockpiled outside of riparian reserves about 600 feet from McNeal Creek, as analyzed in the EA.

- No holding / settling ponds will be constructed.

- Although the amount of water withdrawal is unchanged due to the sustained need for road dust abatement, the initial 15,000 gallon start-up water withdrawal (HBAR 2548) is no longer required.

- A maximum of two 1,500 gallon above-ground water tanks will be temporarily placed on the lower portion of the mining claim to facilitate the storage of water for dust abatement. Tanks will be located 345 feet from McNeal Creek and will require a 12-foot wide by 24-foot long area to be leveled for tank placement.

- Following milling operations and the completion of excavation, the processing tailings will be hauled back to the mine site and deposited to fill the trench.

- One gate will be installed along the temporary road, 430 feet from McNeal Creek.

(HBAR 15053–54.)

Plaintiffs argue that the proposed modifications are substantial and thus warrant analysis

1   in a new EA, a supplemental EA, or an EIS.  (ECF No. 36 ¶ 110–120.)  Plaintiffs cite *Dubois v.*

2   *U.S. Dept. of Ag., et al,*. 102 F.3d 1273 (1st Cir. 1996) in support.  In *Dubois*, the plaintiff sued

3   the Forest Service under NEPA, alleging that it had improperly granted a permit to a ski mountain

4   operator to expand the ski resort.  *Id.*  The plaintiff argued that a supplemental EIS was required

5   because the selected alternative in the final EIS embodied "substantial changes" from any of the

6   alternatives proposed in prior drafts of the EIS.  *Id*. at 1292.  The selected alternative including

7   widening existing trails, building a 28,500 square foot base lodge facility, and developing ski

8   trails, access roads, and lifts on land; the selected alternative proposed that these developments

9   occur within the current permit area rather than additional land.  *Id*.  In finding for plaintiff, the

10  First Circuit concluded that the modifications at issue were substantially different from

11  previously-discussed alternatives and not mere modifications "within the spectrum" of those prior

12  alternatives.[9]  *Id*.  The modifications involved a new configuration of project elements that could

13  pose "wholly new problems"; thus supplemental analysis was required.  *Id*. at 1293.

14          The modifications detailed in the SIR in the instant case are not analogous to those in

15  *Dubois*.  The SIR also details the following steps taken by the Forest Service to review the effects

16  of the proposed modifications.  The minerals administrator visited the site on October 1, 2012 and

17  November 26, 2012 and determined that relocating the mill would result in less ground

18  disturbance on federal land than was considered in the EA analysis.  The Forest Service

19  conducted analysis in consultation with specialists, with respect to public safety, air quality,

20  hydrology and soils, fisheries, vegetation, wildlife, cultural and heritage resources, and recreation

21  (HBAR 15055–64).  The Forest Service determined that the only new effects associated with the

22  modified project were related to the use of road 10N04 to haul material to the new mill site.

23  (HBAR 15067.)  However, according to the SIR, road 10N04 is in the National Forest

24  Transportation System, is open to the public, and has been previously used for hauling logs and

25  _____

26  [9] *See* Forty Most Asked Questions Concerning CEQ's NEPA regulations, 46 Fed. Reg. 18026, #29b (1981) (One
    possibility is that "a comment on a draft EIS will raise an alternative which is a minor variation of one of the

27  alternatives discussed in the draft EIS, but this variation was not given any consideration by the agency.  In such a
    case, the agency should develop and evaluate the new alternative, if it is reasonable, in the final EIS. If it is

28  qualitatively within the spectrum of alternatives that were discussed in the draft, a supplemental draft will not be
    needed.")

other material.  (HBAR 15055.)  The plan of operations includes a required bond, which the SIR states will serve as a precaution that the Proponent share financial responsibility for maintenance of the portion of the road used.  (HBAR 15056; *see also* 36 C.F.R. § 212.7.)  With respect to issues raised by increased dust cause by use of the road, the project modifications include a water withdrawal allowance for dust abatement.  (HBAR 15056.) Based on this analysis, Defendants determined that additional environmental analysis was not required.

Plaintiffs do not raise sufficient concerns regarding the adequacy of the SIR to warrant setting aside Defendant's approval of the Project under NEPA.  The Project's consultation history consists of three draft EAs, issued prior to the completion of the operative 2012 EA.  (HBAR 2542.)  This lawsuit was brought prior to the proposed modifications and the issuance of the SIR. The proposed modifications, according to Forest Service analysis, reduce the Project's footprint on Forest Service lands because milling operations have been relocated.  Therefore, the argument is not persuasive that the modifications are sufficiently significant that a supplemental EA or EIS is required.  The Court does not find that Defendants abused their discretion or acted arbitrarily, capriciously, or unlawfully in approving the Project. *See* 5 U.S.C. § 706(2)(A)–(D).

To the extent Plaintiffs claim that Defendants' approval of the Project must be set aside on these grounds (FAC, claim 1), the Court DENIES Plaintiffs' summary judgment motion and GRANTS Defendants' summary judgment motion.

ii. Milling (NEPA)

Plaintiffs argue that Defendants' review of the Project's milling operations, relocated to the private site, was inadequate under NEPA.  Plaintiffs argue that the impact on the Salmon River, due to the new milling location, will be detrimental to fish species and fish habitat in the Salmon River.  Defendants respond that Forest Service jurisdiction does not extend to private lands and that their review was adequate under NEPA. (*See* ECF No. 36 ¶¶ 121–131; ECF No. 48 at 22–25; ECF No. 69 at 11–19.)

The SIR details Defendant's analysis and conclusions regarding milling operations at the private site (*see* HBAR 15061–62) as follows.

12

- It appears that the Proponent has been operating a mill at the private property since at least 2008. The milling site is currently being used to process materials in a reclamation project on adjacent private property. Defendants assumed that these actions required permitting from the State and County.

- Forest Service staff conducted field review, reviewed aerial imagery, and sought input from County staff and local staff regarding milling. The Forest Service's access to the private site was either limited or not provided because the Proponent did not grant the Forest Service access.

- The Forest Service was unable to determine the probability that the ongoing operations were affecting coho salmon or their critical habitat. However, the Forest Service concluded that adding project-related minerals to the already-ongoing operations would not result in adverse effects to SONCC coho salmon or their critical habitat.

- On January 15, 2013, the minerals administrator discussed the proposed modifications with Diana Henrioulle of the North Coast Regional Quality Control Board (the "Water Board"). The Water Board informed the Forest Service that the Proponent had submitted the required waste characterization study.

- The Proponent will be required to provide samples of the ore and tailings material to a California-certified laboratory for a determination of whether there is any toxic material present.

- Water use on the private property falls under the purview of the Water Rights Board, which will make a determination regarding water rights alleged by the Proponent. If the Proponent plans to store water on private property for more than thirty days, there may be additional permits required from the Water Rights Board.

(HBAR 15061–62; HBAR 15076–77.)

The primary issue in the dispute between Plaintiffs and Defendants is the extent of the analysis necessary under NEPA, given that the milling operations take place on a private site. Plaintiffs argue that relocating the mill site should have prompted Defendants to address the State

and County permits that the Proponent would need to obtain prior to beginning work on the Project.  (ECF No. 48 at 22–24; ECF No. 73 at 12–17.)  For example, according to a July 20, 2011, Water Board Inspection Report, attached by Plaintiffs to their April 10, 2013, letter to Forest Supervisor Patricia Grantham, the California Water Code and federal Clean Water Act require that mining facilities obtain a general industrial storm water permit and a general construction storm water permit.  (HBAR 15108.)  The same inspection report indicates that the Proponent will need to obtain a Surface Mining and Reclamation Act permit from Siskiyou County.  (HBAR 15110.)  As indicated in the SIR, the Proponent is required to submit a waste characterization study, in order to classify waste from operations and quantify its potential threat to water quality.  (HBAR 15055.)  Minutes from an October 6, 2010, meeting (pre-SIR) of Forest Service interdisciplinary team specialists also reflect concerns that the Proponent had failed to obtain the requisite county, state, and federal permits.  Those minutes stated: "the Decision Notice will not be signed until the Proponent obtains all required permits and/or waivers."  (HBAR 3322.)[10]

     The SIR contains a minimal discussion of aspects of the local permitting process.  However, Plaintiffs do not provide persuasive authority mandating that additional EA or EIS analysis is required.  The authority cited by Defendants, *Dept. of Transp. v. Public Citizen*, 541 U.S. 752 (2004), is also inapposite, as the issue in that case was the authority of the U.S. Motor Carrier Safety Administration to regulate the operation of Mexican trucks in the U.S.  Plaintiffs do not bring suit here against the Proponent, and Plaintiffs do not advise the Court of the adequacy of a state action to address regulation by county and state entities.  After reviewing the

---

[10] In the April 10, 2013 letter to Patricia Grantham, Plaintiffs stated the following with respect to local regulation at the mill site:

> Currently the proposed site appears to be in violation of County zoning/planning regulations.  The mill site on the property is a nonconforming use that does not have the requisite permits for water quality, water drafting, special use, or zoning permits necessary for its continuation or expansion….  We believe that the Forest Service, the California Water Quality Control Board, and the Siskiyou County Planning Department are aware of the Proponent's illegal discharges.

(HBAR 15097.)

14

1    analysis detailed in the SIR regarding local regulation, the Court does not find that Defendants'

2    analysis was arbitrary, capricious, unlawful, or constitutes an abuse of discretion.

3           Plaintiffs also argue that water withdrawals from the Salmon River at the new mill site,

4    which formerly were to come from McNeal Creek, may be detrimental to fish species at the mill

5    site.  Plaintiffs argue that aspects of these withdrawals should have been addressed in a

6    supplemental EA or EIS.  (ECF No. 48 at 22–24; ECF No. 73 at 12–17.)  Plaintiffs do not

7    produce evidence that these detrimental effects will occur.  Plaintiffs reference *Siskiyou Regional*

8    *Educ. Proj. v. Rose*, 87 F. Supp. 1074, 1086 (D. Or. 1999) for the fact that the Forest Service may

9    reject an unreasonable plan and impose mitigation measures.  In *Rose*, the Forest Service received

10    notices of intent to proceed on three suction dredge and two panning operations in Silver Creek,

11    located in the Siskiyou National Forest.  The court held it was a violation of NEPA for the Forest

12    Service to decline to prepare an EA for any of the individual suction dredge operations, or an EA

13    to assess the cumulative impacts from all the operations.  (*Id.* at 1082–83.)  However, for the

14    instant Project, milling operations will take place at an already existing site.  The proposed

15    modifications, as detailed in the SIR, reduce the Project's footprint on Forest Service land.[11]

16           Plaintiffs reference *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372,

17    1379 (1998) to argue that Defendants should have undertaken a cumulative effects analysis in an

18    EA or EIS.  (ECF No. 48 at 22.)   As a reference point, however, *Cuddy Mountain* involved

19    Forest Service approval of a timber harvest and sale; three other timber sales were proposed in the

20    area, which the court found the Forest Service had inadequately analyzed.  The Court notes that a

21    February 14, 2011, Minerals Report found record of four claims in current ownership status

22    within the McNeal Creek drainage, but none with a current Notice of Intent or approved Plan of

23    Operations.  The same report found record of twelve claims filed between 1891 and 2009, which

24    were abandoned between the 1980s and 2010. (HBAR 3316.)  Plaintiffs do not otherwise advise

25    the Court of past, present, or future actions that would require Defendant to address the Project's

26    cumulative effects in an additional EA or EIS.

---

[11] Plaintiffs stated in their August 10, 2013 letter that milling operations could not have begun until 2011, which is at odds with the 2008 date stated in the SIR (HBAR 15054).  Plaintiffs also stated it is likely that milling activity, prior to this Project, ended in 2012.  (*See* HBAR 15097.)

To the extent Plaintiffs seek summary judgment on these claims (FAC, claims 1 and 4), Plaintiffs' summary judgment motion is DENIED and Defendants' summary judgment motion is GRANTED.

iii. <u>Contamination of milled material (NEPA)</u>

In the FAC, Plaintiffs argued that the EA and the SIR do not adequately assess whether the ore milled at the private site could be contaminated before being transported back to refill the mining trench during the reclamation process.  (ECF No. 36 ¶¶ 132–146.)  Plaintiffs direct the Court to the fact that, prior to the proposed modifications detailed in the SIR, the EA had contemplated an alternative that called for milling on private land.  However, this alternative was eliminated because "soils moved to and processed on private property can become infested with an assortment of noxious and invasive plant species and could, therefore, infect NFS land when returned to the site for reclamation … there can be no assurances that the materials have not become infested with noxious weeds, or that toxic chemicals have not been utilized in the gold recovery process."  (HBAR 2554.)  Plaintiffs argue that the proposed modifications essentially re-adopt this alternative without assessing the environmental impact of returning contaminated material to the mine site.  (*See* ECF No. 36 ¶¶ 132–146.)  Plaintiffs also raised concerns regarding contamination in their April 10, 2013, letter to Patricia Grantham, in which they stated it is "extremely likely" that the processed material at the new mill site will be contaminated with noxious weeds and invasive plants.  (HBAR 15094.)

Plaintiffs do not pursue this argument in their summary judgment motion and supporting briefing, and Defendants do not respond to this argument.  The relevant PDFs designed to mitigate effects from contamination, as stated in the EA, appear to be BOTANY-1 through BOTANY-5, which address equipment use, noxious weed surveys, parking, the stockpiling of material for mill processing and re-filling the mining trench, and re-seeding and re-planting the area following excavation.  (HBAR 2551–52.)  Defendants do not make a showing that the Project will comply with these specific PDFs at the private site, and it appears their position would be that private compliance with these PDFs (or something analogous) by the Proponent is not required under NEPA.  Without more, the Court will not set side Defendant's approval of the

16

1  Project (and effectively enjoin the Project) on these grounds.  To the extent that the parties seek

2  summary judgment on these grounds (FAC, claim 1), Plaintiffs' summary judgment motion is

3  DENIED and Defendants' summary judgment motion is GRANTED.

4  iv.  <u>Withdrawals from McNeal Creek (NEPA)</u>

5  The Court reads the EA and the SIR to permit water withdrawals from McNeal Creek as

6  necessary for mining operations, and to abate dust on road 10N04 given the new hauling route.

7  To evaluate the effect of withdrawals, Defendants considered previous stream flow measurements

8  (EA, Table 3.1; HBAR 2560), which are as follows.  Flow measurements in McNeal Creek at the

9  fish passage (the upper bridge on road 10N04) were taken in August of 2008, 2009, and 2010.

10  The mean flow rate for this period was 0.94 cfs.[12]  The Salmon River Restoration Council flow

11  rate measurement in mid-August 2009 was 1.77 cfs.  The flow rate measured in October 2010

12  was 4.3 cfs.  In early June 2011, the flow rate was measured at two sites in McNeal Creek (at the

13  10N04 bridge and the County Road bridge), giving measurements respectively of 6.2 cfs and 6.5

14  cfs.  The EA also states there are three private water withdrawal sites from McNeal Creek to

15  residences in Forks of Salmon: one site about 0.25 miles upstream from the mouth of the creek,

16  and two sites about 100–200 feet above the 10N04 bridge (above the proposed withdrawal point

17  for the Project), which collectively are estimated to divert 1.5 to 2 cfs.[13]  (HBAR 2560.)

18  The EA determined that "the only negative direct effects on water quality [in McNeal

19  Creek] would be from water transmission."  (*See* HBAR 2560.)  The relevant PDFs include

20  limiting withdrawals to 30 minutes per day and between midnight and 8:00 AM; limiting

21  withdrawals to a maximum of 200 gallons per minute (thus 6000 gallons per day); and permitting

22  withdrawals only when the stream flow is at or above 4.5 cfs.  (HBAR 2560.)  Therefore,

23  Defendant assessed that an indirect effect of withdrawals would be the reduction in downstream

24  pool volumes by an estimated 10 percent, for a duration of up to 30 minutes while withdrawal

25  occurred.  (HBAR 2561.)

26  [12] There are four measurements for August flow rates listed in the EA, Table 3-1: 1.1 cfs, 0.9 cfs, 1.5-2.0 cfs, and 0.9

27  cfs.  (HBAR 2559.)  It appears therefore, that the 0.94 cfs mean flow rate for August, stated in the EA, was taken from additional and/or other measurements.

28  [13] The Court does not see where the Project's proposed withdrawal point from McNeal Creek is located.

Plaintiffs argue that Defendant's analysis of the flow rate in McNeal Creek did not establish an adequate baseline from which to assess the impact of the Project.  (ECF No. 48 at 7–11.)  *See Northern Plains Resource Counc. Inc. v. Surface Transp. Bd*., 668 F.3d 1067, 1083 (9th Cir. 2011) ("NEPA requires that the agency provide the data on which it bases its environmental analysis.").  However without more, the Court does not find that the measurements for flow rate contained in the EA are inadequate.

Plaintiffs also argue that the Project cannot be accomplished within its three-year time frame and still comply with its plan of operations.  *See* 36 C.F.R. § 228.4 (providing for the submission of a plan of operations for approval by an agency officer); 36 C.F.R. § 228.7 (providing for inspection by the agency officer and recourse in the event of non-compliance).  As Plaintiffs argue, the operating season will run from July 10 to October 15, unless surveys show no northern spotted owls in the area, in which case the Proponent can begin operations on May 15. (ECF Nos. 51 ¶¶ 23, 24; ECF No. 70 ¶¶ 23, 24.)  The Proponent may only withdraw water when the stream flow is at or above 4.5 cfs.  However, the stream flow data from between July and October indicates that the flow rate may be below 4.5 cfs for that entire period.  (EA, Table 3.1; HBAR 2560.)   Therefore, for the duration of the normal operating season, July to October, the Proponent may not be able to withdraw any water.  Plaintiffs argue that the analysis in the EA is deficient because it fails to disclose the extent to which the 4.5 cfs flow requirement limits operations during the operating season, and may render the Project incapable of being accomplished.

However the primary concern regarding water withdrawals from McNeal Creek, as stated in the EA prior to the proposed modifications, pertained to milling.  Because milling operations have been moved to a private site, withdrawals for this purpose are no longer needed.  The SIR considers the amount of water withdrawal for the Project to be unchanged, but attributes these withdrawals to be used for dust abatement.  No more than two 1,500 gallon above-ground water tanks will be temporarily placed on the lower portion of the mining claim to store water for dust abatement.  (HBAR 15054.)  There is not sufficient indication at this point that the Proponent will fail to comply with the PDFs, including the limitation on withdrawals when stream flow is below

4.5 cfs.  *See* 36 C.F.R. § 228.7 (providing for inspection by the agency officer and recourse in the event of non-compliance).  If the Proponent is not able to draw water from McNeal Creek between July and October, then that is the consequence of the PDFs established in the EA and the SIR.  However without more, the Court will not presume that the Project cannot comply with its plan of operations, and that Defendants' approval was therefore arbitrary, capricious, unlawful, or resulted from an abuse of discretion.

To the extent that the parties seek summary judgment on these grounds (FAC, claims 1 and 6), Plaintiffs' summary judgment motion is DENIED and Defendants' summary judgment motion is GRANTED.

v.  Thermal refugia at McNeal Creek / SF Salmon River confluence (NEPA)

Plaintiffs allege that the EA and other consultation documents fail to disclose sufficient baseline information about the Project's effects on water temperature in McNeal Creek.  (ECF No. 48 at 7–11.)  Plaintiff's primary concern regards the thermal refugia created at the confluence of McNeal Creek and the SF Salmon River, which provides critical and essential fish habitat. (ECF No. 48 at 7–11; No. 36 ¶¶ 202–11.)

The Fisheries Report states:

> Visual observation of the McNeal Creek / SF Salmon River confluence during base flow conditions suggests the refugia to be marginal. [] McNeal Creek enters SF Salmon River within a rapid; and there is a lack of features at the mouth to shelter fish in the form of either a defined scour pool or overhead cover.  While McNeal Creek water temperature does appear to be less than SF Salmon River during summer and early-fall months, flow contribution of the former is 1-2% of the latter [citations], which minimizes thermal effects of the tributary plume upon the mainstem.  A visit to the mouth in 2009 estimated the cool water zone to be 40-80 feet long [citations].  As a thermal refugia, McNeal Creek outflow with SF Salmon River is likely restricted to small resident fishes, coho and steelhead juveniles, or as transient use by migrating spring Chinook or summer steelhead (suitable holding pools are present both above and below the rapid).  A stream survey in 2002 found two coho, two Chinook, and three steelhead (no ages provided) at the mouth of McNeal Creek [citations]; and a thermal refugia survey found in 2005 found 105 steelhead [measurements] and six [measurements] Chinook utilizing the plume.  Photos from 1979 show the mouth to be

19

1

similar to that observed in 2010, suggesting stream morphology is stable.

2

(HBAR 3400; the same analysis appears in the EA, HBAR 2565.)

3

     With respect to flow contribution of McNeal Creek to SF Salmon River, the Court views

4

the EA to rely upon a 0.94 mean cfs flow rate for McNeal Creek, compared to 134 cfs measured

5

at the Salmon River gauge, and 253 cfs measured at the Salmon River scale (HBAR 2559), which

6

would equate to McNeal Creek contributing flows of 1 to 2 percent to SF Salmon River flow.

7

Plaintiffs state that, with respect to the 134 cfs rate measured at the Salmon River gauge, this

8

measurement was taken at the mouth of the Salmon River near Somes Bar, California, 19 river

9

miles downstream of the mouth of the SF Salmon River; therefore this measurement does not

10

provide accurate baseline information.  (ECF No. 73 at 4, n.2.)  While the Court acknowledges

11

this point, Plaintiffs do not provide indication that the flow contribution to the SF Salmon River is

12

different than the 1 to 2 percent figure stated in the EA.

13

     Plaintiffs make reference to comments made by Don Flickinger, a representative from the

14

NFMA and the National Ocean and Atmospheric Administration (NOAA), following Mr.

15

Flickinger's visit to the site on October 2, 2009.  Mr. Flickinger wrote in November, 2009:

16

17

18

19

20

> The importance of McNeal Creek's cold water contribution to the South Fork Salmon River (SONCC coho salmon Critical Habitat) cannot be overstated …. The lower South Fork Salmon River is one of 3 reaches in the Salmon River Basin that offers anadromous fish relatively low gradient habitat [].  These low gradient river reaches provide some of the best salmonid rearing and summer refugial habitat.  Maintenance and restoration of these key habitats is essential to restoration of anadromous fish species in the Salmon River, while also helping achieve TMDL targets.  The location of McNeal Creek's confluence with the South Fork of the Salmon River, less than one mile from Forks of Salmon, and the summer refugia that it provides heightens its importance in lowering river water temperatures in the Forks of Salmon area – the South Fork, North Fork and Mainstem Salmon River convergence zone.  This zone has been documented as having some of the highest summer water temperatures in the Salmon River.  Any reduction of McNeal Creek's cold water contribution to this zone could pose a significant risk to anadromous fish rearing there, particularly in years of lower flows and warmer water temperatures.

21

22

23

24

25

26

27

28

1   (Oct. 2, 2009 Site Visit and Follow-up Comments, HBAR 3267.)

2       Mr. Flickinger made these comments prior to the Forest Service's development of the

3   PDFs designed to mitigate withdrawals.  According to the BA, following Mr. Flickinger's initial

4   site visit on October 2, 2009, draft BA documents were sent to Mr. Flickinger on February 1,

5   2011, and March 21, 2011.  (HBAR 3438.)  Additional "technical assistance" occurred on June 7,

6   2011, to "develop resource protection measures for water use – amount and timing of diversion –

7   from McNeal Creek to avoid incidental take of coho salmon or adverse modification of their

8   critical habitat."  (HBAR 3438.)  The BA was finalized and approved on June 10, 2011.

9   Therefore, the Court does not view these comments, made prior to the establishment of PDFs

10  designed to address concerns regarding impacts to the flow rate and temperature of McNeal

11  Creek, to demonstrate that Defendants' analysis was inadequate.

12      To the extent that the parties seek summary judgment on these grounds (FAC, claim 5),

13  Plaintiffs' summary judgment motion is DENIED and Defendants' summary judgment motion is

14  GRANTED.

15  vi.  Hauling (NEPA and NFMA)

16      Plaintiffs make two claims regarding hauling.  In claim 2 of the FAC, Plaintiffs argue that

17  Defendants did not adequately analyze and disclose the effect of hauling on McNeal Creek.

18  Plaintiffs argue that sediment generated from hauling may reach McNeal Creek and cause its

19  sediment levels to rise, which violates the Aquatic Conservation Strategy (ACS) objectives

20  contained in the Klamath LRMP.  The Court construes this claim, because it references the ACS

21  objectives in the Klamath LRMP, to allege a violation of the NFMA.  (ECF No. 36 ¶¶ 147–54.)

22  Plaintiffs also bring this claim as a violation of NEPA on grounds that it represents a potentially

23  significant impact that Defendants failed to properly disclose or consider.  *See* 40 C.F.R. §

24  1508.27(b)(10).  In claim 3 of the FAC, Plaintiffs allege that the Project, due to the number of

25  loads scheduled per day to be hauled between the mill site and the mine site, cannot be

26  accomplished within the three-year time frame contemplated by the plan of operations.  Plaintiffs

27  claim that this violates NEPA.  (ECF No. 36 ¶¶ 155–180.)

28      ACS Objective 5, contained in Appendix B to the Fisheries Report, states that Defendants

21

shall "Maintain and restore the sediment regime under which aquatic ecosystems evolved. Elements of the regime include the timing, volume, rate, and character of sediment input, storage, and transport." (HBAR 3422.) The Fisheries report made a finding of "No effect" and concluded: "This Project will not alter the sediment regime, and therefore it will not affect aspects of sediment input, storage, and transportation." (HBAR 3422.) Defendants also respond that road 10N04 has in-board ditches to collect sediment run off and cross drains to convey excess water and sediment away from the road, and that there is vegetation between road 10N04 and McNeal Creek which will serve as a buffer to prevent sediment from reaching the creek. (ECF No. 69 at 26; HBAR 15051.) Plaintiffs do not provide further support that the use of 0.60 miles of road 10N04 for hauling, a road that apparently is open to the public and is currently being used, will cause sediment levels in McNeal Creek to rise. Thus, the Court does not find that Defendants have violated ACS objectives regarding sediment, based on the arguments put forth by Plaintiffs.

With respect to the second claim, both parties provide calculations regarding the number of loads hauled per day, which purport to show that the Project either is or is not capable of being accomplished within the three year time frame. As detailed in the EA, the Project calls for the excavation of approximately 24,500 cubic yards of ore material. (HBAR 2544.)[14] The SIR considers a truck with a capacity of 12 cubic yards to haul a maximum of 15 loads per day of the material between the mine site and the mill site. (HBAR 15054.) The normal operating season is the roughly 14-week period between July 10 and October 15, for a period of three years. (ECF Nos. 51, 70; ¶¶ 23, 24.) A 12 cubic yard capacity truck, hauling 15 loads per day, can haul 180 cubic yards per day. Over a 14 week (98 day) period, 17640 cubic yards can be hauled. Over a three year period, 52,920 cubic yards can be hauled. Presuming Plaintiffs' scenario (ECF No. 51 ¶ 36–39) that all 24,500 yards of material will have to make an independent trip back to the mine site after it is milled, equaling 49,000 cubic yards to be hauled, the Project is technically capable of being completed within the three year time frame. Plaintiffs speculate that the Proponent's

---

[14] The Court presumes that either approximately 24,500, or "up to" 24,500 cubic yards will be hauled to the mill site, per the parties' statements of undisputed facts. (ECF Nos. 51, 70 ¶ 36.) The Court does not rely here upon a 45,000 cubic yard estimate, which appears at points within the EA (HBAR 2590) and SIR (HBAR 15061).

operations may be delayed because the project design features call for dust abatement along the hauling route, and given decreased flow rates during the operating season, water withdrawals from McNeal Creek may not be available for dust abatement.  (ECF No. 36 ¶¶ 176–77.)  Without more, the Court declines to set aside Defendant's approval of the Project on these grounds, on the basis that Defendants' analysis was arbitrary and capricious.  For example, the SIR provides that above-ground water tanks will be placed on the lower portion of the mining claim to be stored for dust abatement.  (HBAR 15054.)  It appears possible that the tanks could be filled only when the flow rate in McNeal Creek is above 4.5 cfs, and dust abatement could still be achieved.  The Court's "proper role is to ensure that the Forest Service made no 'clear error of judgment' that would render its actions 'arbitrary and capricious.'"  *The Lands Council v. McNair,* 537 F.3d 981, 993 (9th Cir. 2008) (citing *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 378 (1989)).  This type of error does not appear to be present.

To the extent the Parties seek summary judgment on these grounds (FAC, claims 2 and 3), the Court DENIES Plaintiffs' motion for summary judgment and GRANTS Defendants' motion for summary judgment.

vii.  Other ACS objectives

In addition to arguments regarding hauling and non-compliance with ACS objective 5, Plaintiffs argue that the Project does not demonstrate consistency with ACS objectives regarding water quality and in-stream flows, for McNeal Creek and Salmon River.  (ECF No. 36 ¶¶ 233–38.)  The Court construes this argument to allege non-compliance with ACS objectives 4 and 6.

Objective 4 states that the Forest Service shall "[m]aintain and restore water quality necessary to support healthy riparian, aquatic, and wetland ecosystems."  (HBAR 3421.)  The Forest Service made a finding of "No effect" and concluded: "Rate and amount of water withdrawn during diversion/drafting operations will be insufficient to alter in-stream temperatures.  There will be no effect to stream shading.  Water quality related BMPS [Best Management Practices] will be enacted."[15]  (HBAR 3421.)

---

[15] For a list of the BMPs, see Appendix C to the EA (HBAR 2598) and Appendix B to the SIR (HBAR 15066).

Objective 6 states that the Forest Service shall "[m]aintain and restore in-stream flows sufficient to create and sustain riparian, aquatic, and wetland habitats, and to retain patterns of sediment, nutrient, and wood routing.  The timing, magnitude, duration, and spatial distribution of peak, high, and low flows must be protected."  (HBAR 3422.)  The Forest Service made a finding of "May effect" and concluded: "In-stream flows will be affected due to diversion or drafting activities.  However, restrictions which include flow threshold, rate of diversion/drafting, timing, and duration will minimize effects and protect peak and baseflows."  (HBAR 3422.)

Plaintiffs do not provide further indication that non-compliance with objectives 4 and 6 should overturn Defendant's approval, beyond the concerns the Court has addressed regarding water withdrawals from McNeal Creek for which PDFs were designed, and regulation of the private mill site.  Plaintiffs cite *ONRC v. Goodman*, 505 F.3d 884, 895 (9th Cir. 2007) for the proposition that regardless of the degree of impact resulting from a proposed action, the NFMA and ACS "contain[] no *de minimis* exceptions."  However, this proposition in *Goodman* referred to the Forest Service's decision (found to violate the NFMA) to exempt "potentially unstable" lands from designation as riparian reserve, in contravention of this requirement in the ACS.  *See Goodman,* 505 F.3d at 894–95.  Without more, the Court does not extrapolate the *Goodman* concern to stand for the proposition that the Forest Service must bar any aspect of a plan of operations that impacts water flow or water quality.  Therefore, the Court does not set aside Defendant's approval of the Project on these grounds.

viii.  Klamath LRMP standard MA10-34 (NFMA)

Per standard MA10-34, the Forest Service shall:

> Require a reclamation plan, approved Plan of Operations and reclamation bond for all minerals operations that include Riparian Reserves. Such plans and bonds must address the costs of removing facilities, equipment and materials; recontouring disturbed areas to near pre-mining topography; isolating and neutralizing or removing toxic or potentially toxic materials; salvage and replacement of topsoil; and seedbed preparation and revegetation to meet Aquatic Conservation Strategy objectives.[16]

Plaintiffs argue the EA does not comply with MA10-34 because it fails to disclose a

---

[16] Klamath LRMP, Chapter 4: "Management Direction," p. 4-111.  Accessed 8/25/14;
http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5333205.pdf.

1   specific reclamation plan, because it fails to explain how revegetation or erosion control measures

2   will be accomplished, and because it does not disclose or analyze the costs of reclamation. (ECF

3   No. 36 ¶¶ 216–23.)   Defendants respond generally that the Proponent must have the required

4   state, county, and federal permits before the Forest Service issues an approved final Plan of

5   Operations, and that the Proponent must submit a reclamation plan and bond to Siskiyou County.

6   (ECF No. 69 at 28.)

7       The Plan of Operations (prior to the SIR) is contained in Appendix B to the EA.  (HBAR

8   2590.)  With respect to vegetation removal, the EA states that vegetation at the mine site is

9   dominated by brush and a minor amount of Douglas-fir, madrone, and knobcone pine.

10  Approximately six merchantable Douglas-fir trees (12-18 inches diameter at breast height) are to

11  be removed and retained on site for mining purposes.  Vegetation will be removed by cutting with

12  chainsaws, loading the brush onto a dump truck, and hauling it to a disposal location near McNeal

13  Creek road, where it will be piled and burned as directed by the Forest Service.  Removal of

14  vegetation on the 1.4 acre mine site will be done in stages as necessary to remove overburden and

15  to access placer deposits.  Brush removal at stockpile areas will occur over an approximately 2

16  week period.  (HBAR 2590–94.)

17      The Reclamation Plan included in Appendix B to the EA is cursory, and states the

18  following.  Reclamation will occur as identified in the Overburden Soil Removal section of the

19  plan of operations.  After soil is replaced and graded, the site will be revegetated as directed by

20  the Forest Service.  The access road to the mine site will be graded to provide drainage off the

21  roadway.  Erosion control measures will be installed where necessary and water constructed (if

22  needed) at locations approved by the Forest Service.  Material will be removed from stockpile

23  locations for use in reclamation.[17]  Disturbed areas will be graded and revegetated as directed by

24  the Forest Service.  Brush piled for disposal will be burned as directed by the Forest Service.  It is

25  expected that brush will be burned each year during the wet season after sufficient amounts have

---

26  [17] EA, Appendix B, Figure 1 provides an overview of the overburden removal and storage process.  The mining

27  trench is split into blocks.  Overburden is removed from block 1 and placed into stockpile; then the placer deposits
    beneath are removed and taken to the mill site for processing.  Subsequently, overburden from the adjacent block 2 is
    removed and placed into the excavated area from block 1, and deposits from block 2 are removed.  The process

28  repeats for subsequent blocks.  (HBAR 2596.)

1   accumulated.  (HBAR 2594-95.)

2       BMP 2.13 describes the Erosion Control Plan considered by the Forest Service.  (HBAR

3   2603.)  The EA states that the Water Board governs the permits and plans required to meet the

4   objectives of the Erosion Control Plan.[18]  With respect to the costs of reclamation, it appears that

5   the EA or SIR does not detail the "costs of removing facilities, equipment and materials" as stated

6   in MA10-34.  Plaintiffs do not provide indication that this omission will impede the objectives of

7   the Klamath LRMP.

8       Without more, the Court does not view Defendant's assessment of the Project's

9   compliance with MA10-34 to constitute grounds for setting aside approval of the Project.  To the

10  extent the parties seek summary judgment on these grounds (FAC, claim 7), Plaintiffs' motion for

11  summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED.

12  ix.  Klamath LRMP standard MA10-35 (NFMA)

13      Per Forest Plan standard MA10-35, the Forest Service shall:

14          Locate structures, support facilities, and roads outside Riparian
            Reserves. Where no alternative to siting facilities in Riparian
15          Reserves exists; locate them in a way compatible with Aquatic
            Conservation Strategy objectives. Road construction will be kept to
16          the minimum necessary for the approved mineral activity. Such
            roads will be constructed and maintained to meet roads
17          management standards and to minimize damage to resources in the
            RR. When a road is no longer required for mineral or land
18          management activities, it will be closed, obliterated, and
            stabilized.[19]
19

20  Under the ACS, riparian reserves are essentially buffer zones along streams, lakes, wetlands, and

21  mudslide-risk areas.  *Oregon Nat. Res. Counc. Fund. v. Goodman*, 505 F.3d 884, 893–94 (9th

22  Cir. 2007).  ACS standards and objectives "prohibit or regulate activities in [r]iparian [r]eserves

23  that retard or prevent attainment of the [ACS] objectives."  *Id.*  Plaintiffs argue that Defendants

24  violated MA10-35 because Defendants failed to determine in the EA whether there existed a

25

26  [18] The Court presumes this is the California North Coast Regional Quality Control Board.

27  [19] Klamath LRMP, Chapter 4: "Management Direction," p. 4-111.  Accessed 8/25/14;
    http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5333205.pdf.
28

viable way to complete the Project, without siting it in riparian reserves.  Plaintiffs state that the access road, water line, and the haul route are all sited within 350 feet of McNeal Creek, which Plaintiffs consider to be designated riparian reserve.[20]  (ECF No. 36 ¶¶ 224–232.)  Defendants respond that the original site plan proposed activities within riparian reserves, but per PDF HYDRO-8 (HBAR 2553), none of the current proposed ground-disturbing activities are within riparian reserves, except for maintenance on NFTS roads, the temporary road on an existing roadbed, and water transmission activities.  HYDRO-8 also provides that the Proponent will follow BMPs regarding equipment refueling and services; will not use hazardous substances; and will complete a spill prevention plan to be approved by the Forest Service prior to approval of the plan of operations.  (HBAR 2553.)

The Court's examination of the EA, Appendix B, Figure B-2 (HBAR 2597) does not show clearly that the access road, water line, and haul route are within riparian reserves, but presuming that this is an accurate statement, it appears that HYDRO-8 partially addresses Plaintiffs' concerns regarding ground-disturbing activities within riparian reserves.  The Court acknowledges Plaintiffs' concerns that an alternative to locating all components of the Project outside of riparian reserves was not specifically contemplated, to the Court's knowledge, in the EA.  The alternatives considered in the EA were alternative 2 (the no action alternative) and alternative 3 (the difference between the Project and alternative 3 was alternative 3's decrease in the size of the water transmission line connecting operations to McNeal Creek).  (HBAR 2550.) However, without more, the Court will not set aside Defendants' approval of the Project on these grounds.  To the extent the parties seek summary judgment on this issue (FAC, claim 8), Plaintiffs' motion for summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED.

x.  Marketability Test (30 U.S.C. §§ 22)

The Court construes the FAC to argue that the EA and SIR fail to demonstrate that the Project passes the "marketability test", per 30 U.S.C. §§ 22 and *U.S. v. Coleman* 390 U.S. 599 (1968).  (ECF No. 36 ¶¶ 239–245.)  Under 30 U.S.C. § 22, "all valuable mineral deposits in land

---

[20] The EA designates riparian reserves to be 340 feet from McNeal Creek or the Salmon River.  (HBAR 2553.)

1  belonging to the United States … shall be free and open to exploration and purchase, and the

2  lands in which they are found to occupation and purchase, by citizens of the United States ….”

3  What is defined as a “valuable mineral deposit” is determined by the application of the “prudent

4  person test.”  The mineral deposit must be of such quality and quantity that a “person of ordinary

5  prudence would be justified in the further expenditure of his labor and means, with a reasonable

6  prospect of success in developing a valuable mine.”  *Husman v. U.S.*, 616 F. Supp. 344, 346 (D.

7  Wyo. 1985) (citing *Castle v. Womble*, 19 L.D. 455, 457 (1894)).  The test was refined in

8  *Coleman*, which held that under § 22, it must be shown that the mineral can be “extracted,

9  removed, and marketed at a profit,” also known as the “marketability test.”  *Coleman*, 390 U.S. at

10  601.

11        Plaintiffs do not pursue this claim in their motion for summary judgment.  The Court

12  presumes that the completion of Phase 1 of the Project resulted in a determination by the

13  Proponent and Defendants that there were sufficient mineral deposits in the claim to warrant

14  further development.  (*See* Feb. 14, 2011 Minerals Report, HBAR 3313.)  Because there is no

15  evidence at this time that the minerals to be extracted will not be profitable, the Court declines to

16  set aside Defendant’s approval of the Project on these grounds.  To the extent the parties seek

17  summary judgment on this issue (FAC, claim 10), Plaintiffs’ motion for summary judgment is

18  DENIED, and Defendant’s motion for summary judgment is GRANTED.

19  **VI.  <u>Conclusion</u>**

20        For the reasons stated above, Plaintiffs’ motion for summary judgment (ECF No. 53) is

21  DENIED.  Defendants’ motion for summary judgment (ECF No. 68) is GRANTED.  The Clerk

22  of the Court is directed to close the case.

23

24  Dated: October 1, 2014

25

26

27                   Troy L. Nunley
                 United States District Judge

28